UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

STEVEN M. SHERMAN,

                  Plaintiff,

     -against-

TOWN OF CHESTER, THE TOWN BOARD,
WILLIAM TULLY, EDWIN J. GARLING,
LESLIE DOTSON, AND GARLING ASSOCIATES,

                Defendants.
-----------------------------------------------------------------

**COMPLAINT**

**08 CIV. 4248**
**JUDGE KARAS**

Plaintiff STEVEN M. SHERMAN, through his attorney MICHAEL D. DIEDERICH, JR., complains of the defendants as set forth below.

### INTRODUCTORY STATEMENT

*This is a action for damages, injunctive and declaratory relief against defendant TOWN OF CHESTER ("Defendant" or "Town") and individual defendants for the regulatory taking of Plaintiff's real property, the denial of his substantive and procedural due process rights, the denial of equal protection under the law, and the discrimination against persons, namely older and disabled persons, whom Plaintiff sought to aid through the provision of housing in this community, and for violation of parallel state law claims. This is the exceptional case, including continuous bad faith and pretextual actions by the Town and its agents, with the municipal illegality rising to the level of constitutional deprivations.*

### THE PARTIES

1. Plaintiff STEVEN M. SHERMAN is, and was at all times relevant herein, citizen of the United States and a resident of the Town of Monroe, County of Orange, State of New York.

2. Defendant TOWN OF CHESTER (hereinafter "defendant Town" or "Town"), upon information and belief, is and at all times relevant herein was a municipal corporation organized

and existing under the laws of the State of New York, with its Town Hall located at 1786 Kings Highway Chester, NY 10918.

3. Defendant TOWN BOARD OF THE TOWN OF CHESTER (hereinafter "Town Board"), upon information and belief, is and at all times relevant herein the duly elected governing body of the Defendant Town.

4. Defendant William Tully (hereinafter "Defendant Tuly" or "Tully"), upon information and belief, is and at all times relevant herein was a resident of the Town of Chester, County of Orange, State of New York, and the Town's former Supervisor. He is named in his individual capacity.

5. Defendant Edwin J. Garling (hereinafter "Defendant Garling"), upon information and belief, is and at all times relevant herein was a resident of the County of Orange, State of New York, and a principal of "Garling Associates."

6. Defendant Leslie Dotson (hereinafter "Defendant Dotson"), upon information and belief, is and at all times relevant herein was a resident of the County of Orange, State of New York, and is a member of "Garling Associates."

7. Defendant "Garling Associates" is, upon information and belief, a trade name under which Defendants Garling and Dotson provide land use planning consulting services, with offices located in the Town of Chester, County of Orange, State of New York.

8. Uncaptioned defendant John Doe (I) is a fictitious name representing any and all currently unknown present or former employees of the Town who participated, or may have participated, in wrongful actions as agents or representatives of the Town, Defendant Tully or the Garling Associates defendants.

2

### *JURISDICTION AND VENUE ALLEGATIONS*

9.  This court has jurisdiction over this action under 42 U.S.C. § 1983 and under 28 U.S.C. § 1331 and § 1343(4).

10. Because all parties are from Orange County, New York, venue is proper in this Court.

### *FACTUAL ALLEGATIONS*

**A. Overview**

11. Plaintiff is a real estate developer and the owner of a 398 acre parcel of land located in the Town.

12. Plaintiff acquired the land with a view toward using and developing such land in an economically profitable and environmentally sound manner, consistent with existing land use and the character of the community.

13. The parcel was and is zoned for residential housing.

14. At the time Plaintiff purchased the property, it contained potentially 568 buildable lots under the then-existing zoning and 1974 master plan.

15. In March 2000, Plaintiff made an application to the Town's planning board for the development of this real property.

16. Plaintiff's proposal was for housing (including clustered lots) totaling 397 units in a new community featuring a golf course weaving through the development, an equestrian facility, baseball field, tennis courts, clubhouse and on-site restaurant.

17. A conceptual map depiction of Plaintiff's original proposal (hereinafter "MareBrook" or "Chester Golf") is annexed as Exhibit "1" and made a part hereof.

18. Under Plaintiff's MareBrook proposal, the golf course and other recreational facilities would be available to both the residents of the new community and the public at large, including all residents of the defendant Town of Chester.

19. Upon information and belief, the proposed golf course and housing was fully consistent with, and would significantly enhance, the land uses which characterized this area of the Town, and would be of significant benefit to the Town, including but not limited to providing recreation, quality housing for retirees, and taxes as a "tax ratable."

20. Upon information and belief, based upon the acreage of his property, Plaintiff's proposed number of housing units was fully consistent with the existing master plan, existing zoning, the existing suburban character of the Town and involved no greater density or type of housing than other residential development in the town.

21. In addition, upon information and belief, Plaintiff's proposed recreational facilities were clearly advantageous, both to the development and to the Town and community.

22. Plaintiff could not know, however, that narrow and selfish personal, political and parochial interests of neighbors and politicians would result in the formulation of, upon information and belief, a secret and illegal municipal policy that MareBrook would never see the light of day.

23. Plaintiff could not know that, upon information and belief, an orchestrated program of obstruction was being designed by then-Supervisor Tully and his hand-picked consultants, Defendants Edwin J. Garling and Leslie Dotson, of Garling Associates, and perhaps also the Town Engineer, Arthur Tully, who may be a relative of Defendant Tully.

24. Plaintiff envisioned MareBrook as an aesthetically beautiful and very pleasant place for people to live, especially suitable for retirees over 55 years of age who could fully utilize the recreational facilities and golf course.

25. Upon information and belief, there is a regional need for housing for active retired people.

26. Plaintiff proposed development, MareBrook, was intended to satisfy this need of older Americans, by providing comfortable housing with the availability of first class recreational and social activities. MareBrook community residents could walk to the clubhouse, play a round of golf, enjoy a meal at its restaurant, bring relatives horseback riding, play tennis, go cross-country skiing on the golf course in winter, and enjoy a quality living environment designed for an active life.

27. However, upon information and belief, the Town and its officials and agents, with improper, unauthorized and illegal motivations, secretly decided that MareBrook would never receive required Town approvals, for reasons totally unrelated to legitimate land use regulation.

28. Upon information and belief, with unlawful intent, the individual Defendants undertook a course of action—under color of the Town's governmental authority—to obstruct and deny Plaintiff any and all economically productive use and development of his property, with the ultimate goal of preventing any development of Plaintiff's land, by making the project financially unviable.

29. Upon information and belief, the Defendants' *modus operandi*, performed under color of State authority, has become clear with the passage of time. It was to allow and encourage Plaintiff to pursue his MareBrook proposal, but to then constantly change the rules for land use development midstream (especially the Town's zoning laws) in order to repeatedly send

5

Plaintiff, quite literally, "back to the drawing board," with Plaintiff incurring substantial additional expense each time (of $100,000 or so).

30. For each of the sequential law use changes (six in the seven years Plaintiff has been seeking approval—a master plan change and five zoning law changes), Plaintiff was required to address all regulatory changes relevant to his proposal, including reconfiguring lots, water, roads, etc., and to prepare new maps, at a cumulative cost which Plaintiff estimates far exceeds one half million dollar (and when the cost of land and time value of money is included, well over $3.5 million in cost).

31. Over the course of his and his consultant's seven years or so of dealings with the Town's Planning Board, Plaintiff received agreement, positive comments and approvals and willingness to give approval, yet then he would find himself stymied by the various actions of the Town Board, most often in the form of a new zoning law affecting Plaintiff's MareBrook proposal.

32. It became clear to Plaintiff that the Town's enactment of land use controls was not for the purpose of legitimate land use regulation, but rather was designed to prevent Plaintiff's from being able to use or develop his land, including constant rezoning which prevented Plaintiff's proposal from ever reaching the end of the application process.

33. Upon information and belief, this was a bad faith and *sub rosa* scheme by the Defendants, one tactic of which was to prevent Plaintiff from ever obtaining a "final decision" on his land use applications from which he could appeal to a higher authority.

34. By constantly changing the Zoning rules, Plaintiff was left without a "final decision" from which he could seek to exhaust administratively remedies or seek a judicial remedy. Essentially, the municipal Defendants always left Plaintiff's application "stranded on the bases,"

directing that a new baseball game be begun without any decision on the game which had been in progress.

**B. Chronology of Continuous Changes in Land Use Controls**

The basic chronology of events reveals Defendants' pattern of intentionally designed obstruction. This chronology follows.

35. Plaintiff's 2000 MareBrook proposal was subjected to a Town-initiated moratorium begun in July 2001.

36. Upon information and belief, Plaintiff's MareBrook proposal was fully acceptable under the zoning which then existed, as well as the Town's 1974 Comprehensive (master) Plan.

37. Upon information and belief, the 2001 moratorium was specifically in response to Plaintiff's proposal.

38. Upon information and belief, the moratorium was not for a unlawful purpose, and was not designed for legitimate land use ends, but rather was intended to be indefinite in duration designed as a tool for stopping or obstructing Plaintiff's MareBrook proposal.

39. The moratorium was ended only after Plaintiff commenced a lawsuit in State court.

40. The Town followed up its moratorium with the formulation and adoption of a new "Comprehensive Plan."

41. Upon information and belief, N.Y. Town Law § 272-a makes a comprehensive plan the local document which governs municipal land use planning and real property development.

42. However, the Defendant Town's 2003 Comprehensive Plan appears to contain intentional omissions and ambiguities which, upon information and belief, were designed by Defendants to allow for selective application of zoning, including application for wrongful reasons inconsistent with sound land use planning.

43. Upon information and belief, the individual Defendants and other people providing input on the Town's 2003 Comprehensive Plan had, as a secret and unstated purpose, the obstruction of Plaintiff's legitimate development of his land and his MareBrook proposal, even though Plaintiff's proposal was fully consistent with the land use planning principles set forth in the Comprehensive Plan (environmentally sensitive, orderly growth) and with commonly accepted principles of land use development used in New York State.

44. Moreover, upon information and belief, Defendants singled out Plaintiff as the only application for development pending before the Planning Board to whom the 2003 moratorium would apply.

45. Upon information and belief, all other pending applications were deemed by the Town Board (at Supervisor Tully's and the Garling defendants' suggestion) to be "grandfathered."

46. Upon information and belief, indicative of the Defendants' intent to later single out Plaintiff for disparate and abusive treatment is the fact that the Town's new Comprehensive Plan, adopted May 1, 2003, failed to specifically identify Plaintiff's MareBrook proposal, even though this was the proposal which provoked the Town's moratorium and creation of a new Comprehensive Plan.

47. Yet, upon information and belief, the land use goals and aspirations set forth in the Comprehensive Plan remained fully consistent with permitting the Plaintiff's MareBrook proposal, because of the many favorable attributes contained in the MareBrook proposal.

48. Upon information and belief, Plaintiff's submission, re-submissions, re-resubmissions, etc., have always been in accord with the Town's organic planning documents, namely, its 1974 and 2003 Comprehensive Plans.

8

49. Upon information and belief, Plaintiff's zoning and re-zonings have not been consistent with its master planning, notwithstanding the requirement that zoning comport with a municipality's Comprehensive Plan, and that zoning not doing so is unauthorized, *ultra vires* and a nullity.

50. After the 2001 moratorium was lifted, Plaintiff revised and resubmitted his MareBrook proposal with a view toward full compliance with the spirit and intent of the Town's new Comprehensive Plan.

51. In this regard, Plaintiff undertook the preparation of a detailed and informationally voluminous "environmental impact statement" ("EIS"), as directed by the Town.[1]  The Town's Planning Board deemed Plaintiff's draft EIS ("DEIS") as being "complete," and, upon information and belief, the document more than adequately addressed all of the environmental concerns raised by the Planning Board, its professional consultants,[2] interested entities, groups and citizens.

52. Thus, in late 2003, it appeared that everything was in order for Plaintiff to receive a hearing on his DEIS and on preliminary plat approval.

53. Plaintiff was entitled to such hearing under Town Law § 276.

54. Nevertheless, for reasons unarticulated to Plaintiff, the hearing was never held by the Planning Board, but instead was canceled in early 2004.

55. At around the time Plaintiff was notified that his hearing had been cancelled, he also learned that a new zoning ordinance had been enacted.

---

[1]  The scope and content of an EIS involves content topics defined by the New York State Environmental Quality Review Act ("SEQRA").  *See*, Article 8 of the N.Y.S. Environmental Conservation Law and 6 N.Y.C.R.R. Part 617. A DEIS, in contrast to a much small Environmental Assessment Form ("EAF"), is invariably a large and costly document.

[2]  Defendant Garling and its engineer, Gerald MacDonald, P.E., both of whom also answered to Supervisor Tully.

56. Plaintiff learned of the cancellation, and the hearing was cancelled, after the maximum period of time for the Planning Board to provide such hearing.

57. Thus, upon information and belief, Plaintiff's land use development rights "vested" in his MareBrook application at this time, due to the Planning Board's default in timely acting upon the application. *See*, Town Law § 276(8).

58. Notwithstanding his now-vested entitlement to proceed forward with MareBrook as an application with preliminary approval (an approval which under New York land use law grants a right of development), Plaintiff sought to continue to appease, cooperate with and accommodate the Town's continued requests. Plaintiff did not believe that the MareBrook project would be served in the long run by appearing to be "fighting city hall."

59. Accordingly, in 2004 Plaintiff once again expended the great deal of time and money necessary (approximately $100,000+) to revise his calculations, plans and maps to comply with the Town's new December 2003 zoning law (whether technically bound by it or as a grandfathered or otherwise non-conforming use).

60. However, after Plaintiff completed revising his plans and maps for MareBrook based upon the December 2003 zoning, and without advance notice to him, the Defendant Town, at the behest of Defendants Tully and Garling, enacted another zoning change in or around June 2004.

61. Upon information and belief, this new zoning regulation was designed to affect, and obstruct, Plaintiff's proposed MareBrook project. As a result of these zoning amendments, Plaintiff was once again delayed, again finding the necessity of expending time and money to revise calculations, plans and maps.

62. Plaintiff continued on before the Town's Planning Board, which continued to be receptive to and approving of his MareBrook proposal.

63. Then, in or around May or June 2005, and once again as he was nearing completion of the process before the Planning Board, the Defendant Town, at the behest of Defendants Tully and the Garling Associates defendants, enacted zoning amendments again designed to adversely affect MareBrook and obstruct its development.

64. Plaintiff again was forced to revise calculations, plans and maps. Plaintiff's financial resources were becoming stretched and depleted, as apparently the Town and individual defendants intended.

65. This pattern of obstruction continued, with new zoning again in 2006, and then again in mid 2007, where after Plaintiff submitted a full set of plans and draft supplemental DEIS in April 2007, but then found himself again non-compliant with the new 2007 zoning.

66. Plaintiff submitted a draft supplemental DEIS, but the defendant refused to consider this "complete" for purposes of SEQRA, but instead, upon information and belief, intended to make Plaintiff begin the SEQRA process essentially anew, knowing full well that a re-done final supplemental EIS would reveal that Plaintiff's original proposal was and remains much more environmentally sound than the "by right" application which Plaintiff was relegated to submit based upon the Defendants' continually revised zoning.

67. At this time, Plaintiff found himself unwilling to fund the professional work for further revised plans and revisions regarding this unending change of the zoning code making completion of Town review of any proposal impossible.

68. As the above chronology outlines, as Plaintiff resubmitted his project based upon new zoning requirements, the Town could change the zoning again, and as Plaintiff approached completion again, the Town would enact new zoning requirements again, and again.

69. Plaintiff does believe, however, that he remains entitled to develop his proposal as originally proposed, because he became entitled under N.Y.S. Town Law § 286(8) to a default approval in December 2003, when the Planning Board failed to provide him with a timely hearing on his DEIS and preliminary plat application.

### C.  Bad faith tactic of obstruction

70. Upon information and belief, the Defendants have acted in bad faith by constantly placing a different or new set of zoning requirements in Plaintiff's path.

71. Because the zoning and zoning amendments were Town legislation, this was official Town policy directed at obstructing Plaintiff's use of his land.

72. Because the re-zonings and other obstructions were aimed specifically at Plaintiff, and not supported by legitimate land use justification, upon information and belief, these action amounted to "reverse spot zoning" designed to unlawfully prevent Plaintiff from developing his land.

73. Moreover, as publicly disseminated governmental action, the continual official obstruction of Plaintiff's proposal was also notice to any potential purchasers that the Town would not allow Plaintiff's land to be developed, thereby further rendering the property valueless.

74. Upon information and belief, the Town's *de facto* public notice that Plaintiff's property would not be permitted by the Town to be developed was essentially inverse condemnation of the property, done so in a manner analogous to, but much more profound than, public notice of an intention to institute condemnation proceedings and the ensuing "condemnation blight."

75. Upon information and belief, any potential purchaser could reasonably conclude, from the Town's actions, that any attempt to construct housing on this residentially zoned land would result in re-zonings, *ad infinitim*, to prevent any and all use or development of the land.

76. The Defendants' actions singled out Plaintiff, were done in bad faith, and were designed to prevent any and all development of Plaintiff's land notwithstanding the complete absence of lawful justification for the sequential regulatory controls enacted by the municipal Defendants.

77. Defendants' efforts to obstruct Plaintiff's proposal were despite the fact that, upon information and belief, the Plaintiff's proposal, both as originally conceived and as repeatedly redrawn as a result of the Defendant Town's repeated zone changes, was fully consistent with the goals and aspirations of the Town's 1974 and 2003 Comprehensive Plans.

78. Upon information and belief, the MareBrook proposal was better suited to the real property involved than would be the "of right" development of Plaintiff's land as originally zoned, or as subsequently re-zoned.

79. Based upon the Defendants' *modus operandi*, the facts, and all reasonable inferences permissibly drawn from such facts, a reasonable jury can conclude that had Plaintiff submitted any proposal to the Town, including an "of right" proposal, that before any Planning Board approval and vesting the Town would again exercise its perceived legislative prerogative and, as it did repeatedly between 2001 and 2007, simply "rezone the property" to deny the application and prevent the property's use, and prevent the property's development.

80. Defendants' actions have, upon information and belief, resulted in regulation of Plaintiff's property depriving him of any and all use of the property, and have made the property valueless.

13

81. Defendant's actions have denied Plaintiff all use of his property cumulatively, and also with each of the Town's sequential rezonings.

82. In so doing, upon information and belief, the Defendant Town has taken Plaintiff's property for its (ostensibly) public use without paying compensation.

83. Upon information and belief, the individual Defendants' goal was to force Plaintiff to maintain his property in a perpetually natural state, as "open space."

84. Upon information and belief, open space preservation was a goal sought by various citizens of the Town, and a goal reflected on various Town planning documents.

85. In this regard, Plaintiff's proposal including providing extensive open space, including, for example, his planned golf course, which would be beautiful open space.

86. Nevertheless, Defendants actions and zone change tactics have, upon information and belief, left virtually ALL of Plaintiff's property as forest or open space, thereby taking his property in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution.

## D. Plaintiff's land use proposal included preferred techniques and uses

87. Plaintiff's MareBrook proposal included favor technique and uses, including "clustering" of housing units, to preserve open space and visual aesthetics in the un-clustered areas, and housing for persons over 55 years of age.

88. Upon information and belief, Defendants gave positive lip service to Plaintiff's clustering and over-55 plans, yet sabotaged this for illegitimate motives unrelated to proper land use planning.

89. The upshot was that after 8 years, Defendants' unlawful motivations and obstructive efforts have resulted in an allowance for clustering and senior housing which is less attractive to a reasonable developer than would be a simple "of right" development of evenly dispersed

housing as permitted by "of right" zoning—a result which is contradictory to the Town's expressed land use planning goals and 2003 Comprehensive Plan.

90. Upon information and belief, the "coup de grace" for Plaintiff's MareBrook project was the Town's demand that, regarding minor issues, that Plaintiff prepare (which he did), and then re-prepare, a "supplemental draft" EIS.

91. Upon information and belief the Defendants intended to burden Plaintiff was an unreasonable SEQRA process, again at considerable expense, notwithstanding that a full DEIS had previously been fully submitted and deemed complete, and when such was completed, to likely enact new zoning to compel Plaintiff to again begin anew.

### a. "Clustering"

92. The concept of "clustering" is a land use planning device designed to shift building to one portion of a development, allowing for open space in the other portion. It has many advantages, and is a tool favored both by New York State law and the Town's master plan.

93. The Defendants led Plaintiff to believe that the Town had a *bona fide* desire that Plaintiff's proposal employ clustering.

94. Defendant were, however, disingenuous in this, because they kept constantly changed the requirements of clustering, finally to a point where, 7 years after Plaintiff first proposed clustering, there was no longer any benefit to him in seeking it.

95. In retrospect, it appears that Defendants held out clustering as a carrot to Plaintiff, designed as the ploy of being an attractive reward for Plaintiff to pursue, with no intention of ever granting the reward for this type of environmentally-protective development.

b. **The "Planned Adult Community" -- PAC**

96. Similarly, a planned community for people "over 55 years of age" is a beneficial land use, because it provides housing to citizens who have different needs than citizens of younger age groups.

97. Plaintiff proposed housing designed for people 55 years of age, in a portion of MareBrook approximately 80 acres in size.

98. At the Defendants' disingenuous urging, Plaintiff's plans eventually evolved into a "Planned Adult Community" or "PAC," containing age restrictions designed by the Town.

99. In retrospect, this too was a tactic of obstruction, because the Defendants transformed what Plaintiff had intended as townhouses and condominiums, designed for people not desiring big homes on large parcels, into a more restrictive PAC.

100.    Plaintiff's original proposal, intended to be marketed especially to retirees, was perfectly consistent with the Town's Comprehensive Plan and the character of the community.

101.    Upon information and belief, Defendants' vision of the PAC was more restrictive that necessary, and not in any way sanctioned by the Town's current or prior Comprehensive Plans.

102.    Revealing of Defendants' intentions was its absolutely unreasonable requirement that Plaintiff obtain approval from Orange County for a road and bridge almost exactly parallel to, and a few hundred yards from, a Town road, for the purpose of separately accessing the county highway.

103.    No possible planning justification existed for this demand for Plaintiff to built a subdivision road almost precisely parallel to, and only a short distance away from the existing Town thoroughfare (or "collector") road.

16

104.    Defendant Tully, upon information and belief, concocted this demand that Plaintiff build this unnecessary and duplicative road for arbitrary reasons, which may include selfish personal reasons concerning his own residence in the Town.

105.    Upon information and belief, the fair inference to be drawn is that the requirement for Plaintiff to obtain County acceptance of a patently ridiculous parallel road is that this demand from Defendants was designed solely as an obstruction, to sabotage the MareBrook proposal.

106.    Upon information and belief, the Defendants knew that they were demanding an impossibility from Plaintiff, namely, for Plaintiff to obtain an acceptance from the County for a road and intersection which the County would find abhorrent from a planning perspective, and unacceptable from its viewpoint (though not something which the County had jurisdiction to prevent the Town from requiring).

107.    The County essentially states so much in a letter from a Senior Engineer from its Department of Public Works dated August 15, 2005, indicating that the new road and intersection which Defendants were demanding of Plaintiff was "unacceptable."

### c.    "SEQRA straw that broke this developer's back"

108.    As indicated above, after having his proposal before the Town for seven years, obstructed by new zoning almost every year, and running out of money to continue re-drawing his proposal with each zone change, Plaintiff decided to revise his proposal to involve "of right" uses, which he believed should be accepted as a *pro forma* matter by the Town.

109.    However, when Plaintiff did this, the Town unreasonably required a draft supplemental EIS to supplement his Draft EIS, even though his revised proposal did not involve any substantial threat to the environment, and certainly nothing not addressed in the prior (accepted) DEIS.

110.    Defendants were also creating a paradox for Plaintiff, because his "of right" development would be less environmentally advantageous than his original (clustered, with open space and golf course/recreation) proposal.

111.    Thus, the Town was requiring Plaintiff to produce a document which essentially would describe how his original proposal, which the Town was constantly obstructing, was better than the current "of right" proposal, with the obvious predictable result that the Defendants would direct, after a full SEQRA review, hearing, and Final SEIS, that he re-propose something more akin to his original proposal.

112.    Plaintiff could then continue the unending "run around," or else chose to conclude his participation in this regulatory Land of Oz.

113.    Plaintiff's plight is largely summarized in the letter dated June 6, 2007 from the Town's own Planning Board Engineer , where Professional Engineer Gerald MacDonald wrote that Plaintiff needed to further revise his Supplemental DEIS in various ways (and obviously great additional expense).  Town Engineer MacDonald wrote that various (difficult and arduous to obtain) items need to be obtained and in order to "complete" the draft supplemental DEIS and that Plaintiff needed "SEQR ... completed prior to any Town Board authorization for clustering."  Town Planning Board Engineer MacDonald described how:

> "As the Planning Board will recall. there has been chronological history with this proposal since its initial <u>application in March of 2000</u>. Some of the highlights are as follows:
>
> 1. The Planning Board, on June 21, 2000, adopted a Positive Declaration and required that a Public Scoping be held prior to the necessary preparation of a Draft Environmental Impact Statement . A draft scoping document was prepared and a public meeting was held for comments on the draft scope.  <u>Work was halted</u> on finalizing the scope and DEIS <u>due to the Town Board's moratorium</u>, and the start of a Town comprehensive plan update and revised Zoning Maps and Laws.
>
> 2. Following the lifting of the moratorium, the Planning Board adopted an updated Scoping Document ·and began its review of the submitted the EIS. During the 10/15/03 Planning Board meeting, <u>the DEIS, which. proposed a maximum dwelling unit total of 384,</u> was deemed acceptable for public distribution in preparation for a DEIS Public Hearing. At this

time, the applicant also submitted a Golf Course site plan (14 sheets) and residential subdivision plan (36 sheets) for review.

3. A DEIS Public Hearing was deferred due to the issuance of new Zoning regulations by the Town Board. These new Zoning Laws required Town Board participation and concurrence in PAC and Clustering proposals prior to SEQRA determinations. *** they also required an initial Planning Board finding and clustering benefits and a maximum dwelling count prior to the Town Board's clustering designation. This required a refocusing of the PAC and Clustering plans, as well as a Conventional Yield Plan by the applicant and Planning Board.

4. The Planning Board's review of the Conventional Yield Plans raised several questions on the language and content of the new Zoning Amendments and the appropriate interpretations of them, especially the Cluster Bonus Provisions in § 98-25C and the "Lots to be buildable" section of the Subdivision Regulations (§ 83-22). These reviews and discussions with the applicant resulted in Town Board Zoning Law Amendments to provide further clarifications (June 1, 2004 and June 7, 2005).

5. Meanwhile, the Planning Board on May 18, 2005 adopted a Resolution recommending that the Town Board authorize the clustered portion of the proposed development. The applicant then requested, pursuant to the then existing Zoning, that the Town Board allow the Planning Board to review both the PAC and Cluster proposals. The Town Board did not approve the PAC designation due to the lack of [Defendant Tully's] required direct access to County Road #45 (Laroe Road). They also did not act on the Clustering authorization.

6. In the Spring of 2006, the applicant returned to the Planning Board with a revised Cluster Plan that now omitted the PAC proposal and golf course. Following various review letters/reports by the Planning Board's consultants and responses by the applicant's consultants, it appeared, in view of the Zoning Amendment, which clarified bonus density for clustering, that the maximum number of dwelling units was 241 for the properties.

7. In view of the Zoning Amendment that now required SEQR to be completed prior to any Town Board authorization for clustering, the applicant was informed in September 2006 that a Supplemental Draft Environmental Impact Statement (SDEIS) was required.

8. The current SDEIS dated March 2007 and the subdivision plans dated March 13; 2007 show a total of 238 lots on the site's 398.4 acres. 143 of the proposed lots are clustered. The DEIS that the current document is supplementing was dated September 3,2003. The SDEIS is addressing, among other issues, the amended Town Zoning and the withdrawal of the golf course proposal.

Based upon a review of the SDEIS and Local Law #3 of 2007, adopted by the Town Board on March 6, 2007, the maximum lot count, as indicated in the SDEIS and the accompanying Subdivision Plans, is substantially too high. *** (emphasis added)

114.    Town Engineer McDonald's letter reveals an application which, over a span of

seven years, was presented with a comprehensive plan update (issued on account of Plaintiff's

proposal), with a moratorium or zoning law stopping or materially affecting his proposal in each

of the 7 years (2001-02, 2003, 2004, 2005, 2006 and 2007) following his initial application.

115.   Essentially, after 7 years of delay and obstruction, Plaintiff was informed by the Town that he <u>might</u> be permitted (subject to later Town Board discretionary approval) approximately the same number of housing units using environmentally friendly clustering as with a "by right" conventional plan.

116.   However, upon information and belief, Plaintiff would essentially be required to begin the entire application process anew, including with full SEQRA environmental impact statements and hearing which would, as indicated above, reveal the superiority of the original cluster/senior housing/golf course proposal over the "by right" current proposal.

117.   Thus, Plaintiff's 8 years of pursing a plan which promoted open space through clustering, a beautiful golf course, and housing for retirees and senior citizens was gutted by the Town's and Town Defendants' 8 years of municipal mischief, leaving Plaintiff's property the subject of foreclosure, where a new developer or developers will have the right, under the existing zoning, to build "Euclidean" housing on 3 acre lots, with driveway everywhere entering the Town and county roads—an ultimate result which is directly contrary to the spirit, intent, goals and aspirations of the Town's 2003 Comprehensive Plan and general principles of land use planning.

118.   The Defendants have created, regarding land use development in the Town of Chester, a kind of "Land of Oz," where the municipal officials play the role of Wizard.  Just as Dorothy Gale was required to perform what was intended as impossible before the Wizard would provide her the disingenuously promised return to Kansas, Plaintiff here has had to meet repeated, ever-changing zoning regulations from a Town having no intention to ever grant approval.

119.    Upon information and belief, with the advantage of hindsight, it is now clear that the defendants have intended to create zoning impossibilities for Plaintiff, to exhaust his financial resources, so that his project would never reach final approval, and never get off the ground.

**E.  Unavailability of a State remedy, other than for the constitutional violations alleged herein**

120.    The Defendants' actions have been, upon information and belief, insidious, incremental, undisclosed and intended to deny Plaintiff a land use approval.

121.    Upon information and belief, Defendants designed their strategy such that it was rare for any final action or decision even arguably appropriate for the CPLR article 78 or other judicial review.

122.    Upon information and belief, this is unlike the ordinary land use situation where a land use applicant who believes he or she is aggrieved by a denied Planning Board approval or ZBA variance can seek State court review.

123.    Here, the Town has pursued a hidden agenda of enacting zoning which constantly defeats Plaintiff's reasonable land use expectations, which regulates his land n a manner which has deprived him of its use thereby taking his property for public use without just compensation, and treated him differently than Town residents (and other developers) are treated, and singled him out for mistreatment, thereby depriving him of the equal protection of the law.  The cumulative effect of the disparate, manifestly arbitrary and unfair treatment is the deprivation of Plaintiff's federal constitutional rights.

124.    A review of the facts and chronology reveals that, as to his overall project, Plaintiff could not exhaust "administrative" remedies which otherwise are available to a land use applicant (e.g., ZBA, or a petition to the Town Board), because the constantly changing zoning

always prevented him from reaching the any final stage of decision on his application for his desired land use.

125.    Metaphorically, whenever Plaintiff would reach third base, the Town would halt the game and the applicant told to take a bat and begin the new game anew.

**F.  Plaintiff has acquired vested rights, and a reasonable expectation of the right to develop, his real property**

126.    One can only conclude from an objective examination of all applicable land use regulation and principles of land use law that Plaintiff has acquired a reasonable expectation that he is entitled to develop his MareBrook project as he has proposed in several variations, each variation designed to meet the ever-changing "requirements" of the Town.

127.    First, the ever-changing zoning, as applied to Plaintiff, is contrary to the Comprehensive Plan, the controlling document.  Thus, without legitimate authority, Defendants' unlawful and authorized zoning must yield to Plaintiff's right to use and develop his real property.

128.    Second, under New York law, Plaintiff can properly be viewed as having acquired vested rights to develop his proposal.

129.    Specifically, upon information and belief, Plaintiff's right to develop his land vested in December 2003, because he had a completed DEIS as of on October 15, 2003, and thus a completed application.

130.    A public hearing on the DEIS and preliminary plat approval was required within 62 days, or approximately December 16, 2003, under N.Y.S. Town Law § 276.

131.    Absent such a hearing, upon information and belief, Plaintiff's application must be deemed "approved" by this Court, through the default provisions of Town Law § 276 (8).

132.    Plaintiff has not yet requested a default certificate of approval from the Town Clerk (nor is he required at any particular time to do so).  Nevertheless, Plaintiff believes that he has obtained a vested right, which he requests this Court to so declare as one item of relief set forth below.

### G. Discrimination in Land Use housing— impermissible Age, Disability, Religious and Political non-affiliation motivations

133.    Besides the obviously self-interested desire of some residents to prevent any and all development of neighboring property, the facts and reasonable inferences reveal impermissible discriminatory animus as a motivation for the Defendants obstruction and prevention of Plaintiff's MareBrook proposal.

134.    First, Plaintiff's "PAC" designed for retirees is, by its nature, designed for older citizens, and of these, eventually they will become disabled by virtue of age.

135.    Upon information and belief, bias against both the aged and the disabled was and is a motivation for obstructing the Defendants' obstruction of the MareBrook project.

136.    Second, upon information and belief, to many people in the community (including neighbors in the adjoining "King Tract"), the possible expansion into the Town of a Satmar Hasidim or similar orthodox Jewish community, similar to those people living in the nearby Village of Kiryas Joel, was viewed by Defendants as a community threat warranting preemptive land use control, such as preventing Plaintiff from receiving approval of enough units that, theoretically, a village could be formed under New York law.

137.    Finally, Plaintiff was not "politically connected" in the Town, and did not seek political favor.

138.    As an "outsider," political outsider and politically unaffiliated individual, Plaintiff did not receive the favorable governmental action in land use granted by those who, upon information and belief, were "politically connected."

139.    As one example of political favoritism to those "connected" with Defendant Tully, upon information and belief people and entities with development applications pending when the Town implemented its 2002 moratorium were "grandfathered," whereas the politically "unconnected" Plaintiff was not.

### H. Failure to give notice of intentions; secret meetings; etc.

140.    Because plaintiff had vested property rights, including the right to reasonably use his real property, the Defendant Town was required to provide him with basic due process procedures—notice and an opportunity to be heard—regarding its actions intended to affect his ability to use and develop his real property.

141.    Upon information and belief, Defendants intentionally deprived Plaintiff of procedural due process in that the Town:

- failed to apprise Plaintiff of its and its Supervisor's intentions regarding Plaintiff's property (including their secret agenda and intention to obstruct any and all development);
- failed to provide Plaintiff with notice of, and an opportunity to respond to Defendant Town's and its Supervisor's unarticulated and impermissible grounds for obstructing Plaintiff's proposal;
- failed to provide plaintiff with notice of governmental meetings (e.g. Town Board and comprehensive/zoning land use committee, and "zoning committee" meetings) proposing governmental action specifically affecting Plaintiff's real property and land-use proposals;
- required Plaintiff to seek unauthorized procedures (e.g., prematurely seek Orange County permission for a road which the County would certainly find unacceptable).

24

142.    Upon information and belief, Defendants' actions were frequently designed to respond specifically to Plaintiff's proposals (or rather, Plaintiff's responses to the Town's newest requirements), yet Plaintiff was not provided with actual notice of the Town's intentions to do so, or to make Plaintiff finance such Town effort.

143.    As to actions reasonably affecting Plaintiff directly, and certainly as to actions designed to directly affect Plaintiff, Plaintiff was entitled to actual notice of such and an opportunity to be heard, yet Plaintiff was not provided with notice of the Town's intentions.

144.    The Town's failure to provide such notice, particularly when the Town's proposed action was in the nature of an *ex posto facto* action directed at Plaintiff, upon information and belief, deprived Plaintiff of due process of law.

145.    In this regard, it appears that the Town Board engaged in executive sessions without stating the purpose thereof, which sessions occurred during times whether matters concerning Plaintiff were before the Town Board.

146.    Upon information and belief, the Town created a Zoning Committee for the purpose of providing public input to a master plan under the provisions of Town Law § 272-a, but this committee failed to conduct business in an open and regular fashion, thereby concealing what Plaintiff believes to be improper goals.

147.    Upon information and belief, this was essentially a secret committee with secret meetings, yet influential in both the master planning process, and subsequent zoning enactments.

148.    Such secrecy is improper, and in violation of the N.Y.S. Open Meetings Law. *See*, Public Officers Law § 100 *et seq.*

25

149.    From these and other irregularities, a reasonable factfinder can conclude that dissembling was afoot, with a secret agenda of obstructing Plaintiff's MareBrook proposal with the ultimate goal of impermissibly denying Plaintiff any and all use of his real property.

## I.   Denial of Equal Protection

150.    Plaintiff has been treated differently from Chester's residents and other developers from almost the very introduction of his MareBrook proposal, as described above.

151.    Some additional evidence of disparate treatment include Plaintiff's observation that in 2007, he observed that another applicant's identical "senior housing" proposal was receiving prompt action by the municipal defendants, while Plaintiff's was receiving no action.

152.    Also in 2007, the Town imposed upon Plaintiff a requirement for "stub street connections" on cul-de-sacs, requiring another complete "re-do" of Plaintiff's development plans and map.

153.    Upon information and belief, this was especially disparate and manifestly arbitrary in that, near the beginning of the project, the Town prohibited Plaintiff from having stub street connections on cul-de-sacs.

154.    Upon information and belief, no other applicants were subjected to this form of mid-stream reversal of subdivision street requirements.

155.    Moreover, neither connection nor segregation were addressed in the Town's 2003 Comprehensive Plan, and therefore both requirement appear to have been imposed upon Plaintiff without regulatory authority nor overall planning mandate, but rather imposed simply to burden Plaintiff, to obstruct the development of his real property.

## J.   Denial of Right to Appeal to Zoning Board of Appeals

156.    Upon information and belief, by denying the Planning Board the ability to act on any Plaintiff's various requests under current zoning, because the Town Board kept changing the

zoning rules so that Plaintiff could never get to the point of the Planning Board denying a request, Plaintiff was also denied one important avenue of redress, an appeal to the Town's Zoning Board of Appeals ("ZBA").

157. By preventing a ZBA appeal, the Defendants also prevented a State court challenge to a ZBA denial of relief. Thus, the Town intentionally prevented Plaintiff from having the ability to pursue remedies granted by New York State statute.

158. Upon information and belief, a reasonable inference can be drawn that it became the official policy of the Town, through the zoning enactments of its Town Board, to deny Plaintiff the possibility of a State-created and Town-embraced mechanism for appeal of an unfairness, namely, the ability to appeal to the ZBA.

159. Upon information and belief, this was not a random and unauthorized act depriving Plaintiff of his right to a State-bestowed liberty and property interest (namely, the right to a ZBA appeal), but rather the officially pursued policy of the Defendant Town.

160. Of course, upon information and belief, this is a right which would have been in this case meaningless and ephemeral, as the ZBA was controlled by Defendant Tully, and the ZBA chairman was a staunch opponent of Plaintiff's project.

### K. Right to Petition is Denied

161. Plaintiff repeatedly asked—though petition to the Planning Board, the Town Board, and the former and present Town Supervisors—for permission to use and develop his land.

162. Plaintiff asked expressly and implicitly for redress and an explanation why he was constantly thwarted in proceeding forward, often "at the last minute," just prior to a legitimately anticipated land use approval.

163.    In his most recent petition, Plaintiff requested that the new Town Supervisor and Town Board hear and consider his request for correction action and redress regarding the wrongs done to him relating to his MareBrook proposal, yet received no response.

164.    Thus, Plaintiff repeatedly petitioned this local government for permission to use his real property in a manner which he believed, and believes, is reasonable, appropriate, permissible and in accord with the Town's regulatory guidance (e.g., as articulated in both its former and current Comprehensive Plan).

165.    Yet the Defendant Town, and especially the Town Board and former Town Supervisor, have refused to meaningfully give *bona fide* consideration to Plaintiff's petitions to the Town.

166.    Instead, it appears that the Defendant Town and its former Supervisor, Defendant Tully, sought to give Plaintiff the impression that his petitions (including various land use applications) were being fairly considered, when in actuality these defendants where orchestrating devices and tactics for further frustrating Plaintiff in his desire to reasonably develop and use his real property.

167.    In refusing to meaningfully consider and address Plaintiff's petitions to it, including his various land use applications, Plaintiff was denied his First Amendment right to petition government for redress.

### L. Potential deprivation of honest services of government & civil RICO violation

168.    Defendant Tully, upon information and belief, employed Defendant Garling as his tool and henchman for doing the Supervisor's bidding in municipal affairs involving land use matters.

169.    Upon information and belief, the Garling Defendants have been paid from the Town's public funds.

170.    Upon information and belief, these public funds were obtained through exaction from Plaintiff as a "fee for professional services" invoiced by the Town.

171.    Upon information and belief, Plaintiff believes that well over 75% of the professional services billed by Defendant Garling on account of Plaintiff's proposal, and thus paid for by Plaintiff, was for work which did not involve review under existing regulations, but rather was work undertaken for the benefit of the municipal Defendants to develop new strategies and tactics to obstruct Plaintiff's project.

172.    As such, upon information and belief, these were manifestly unlawful financial exactions from Plaintiff, and an improper billing of the Town by Defendant Garling.

173.    Upon information and belief, if the Town desired to legitimately formulate general land use controls, it certainly could do so—by not by billing a land use applicant to do so.

174.    Essentially, Defendant Garling and the municipal Defendants devised a scheme by which, upon information and belief, they could develop yearly zoning ordinances, to defeat the rights of a single developer, paid for by the developer.

175.    Moreover, defendant Tully, as a public servant, was required to provide honest services to the Town, not self-interested services whereby a land developer's funds would be directed into the pockets of the Supervisor's hand-selected planner, for purposes unrelated to existing regulations, and where, as a recipient of public funds, the Garling Defendants were similarly required to furnish honest professional services, not professionally dishonest services catering to the personal whims of the Town Supervisor, Defendant Tully, unrelated to existing zoning regulations.

176.    Upon information and belief, the actions of Defendant Tully and the Garling Defendants appear to be a form of fraud perpetrated upon the Town's taxpaying public, over an extended period of time exceeding seven years in duration, which as to these Defendants reveals their use of the Town as an instrumentality for engaging in a corrupt enterprise.

177.    In furtherance of the corrupt aspect of this enterprise, Defendant Garling performed work (and indirectly billed Plaintiff for such work), in reviewing Plaintiff's application based upon zoning not yet in existence, for the purpose of developing new zoning.

178.    Upon information and belief, the Garling Defendants' invoices were predominantly unrelated to regulatory review of Plaintiff's proposal, but instead were for general Town-wide legislation manifestly not properly billable to a specific land use applicant such as Plaintiff.

179.    This was a fraud upon Plaintiff and the public, including federal mail fraud in mailing invoices, occurring over 6 years, with numerous mailed fraudulent invoices, involving work not properly billed to Plaintiff's account, nor properly billed to taxpayers.

180.    Upon information and belief, Plaintiff was deprived of money through illegal exactions unrelated to existing land use regulations applicable to him; Defendant Garling was paid funds from the Town (derived from the exactions placed upon Plaintiff) from which he was not entitled; and Defendant Tully received the personal political benefit (among possible others) of obstructing Plaintiff's MareBrook proposal through sequential zoning laws without the need to budget tax dollars for this, because the Town was improperly funded in this by Plaintiff.

**M.  Damages**

181.    Plaintiff has not been allowed to productively use or develop his property during the whole 8 year application process.

182.    Plaintiff has lost two contracts for the sale of lots causing him damages in a sum of approximately $31 million.

183.    Plaintiff was also damage by being required to pay the Town's consultants, the Garling Defendants, for professional work unrelated to regulatory review.

## FIRST CLAIM FOR RELIEF—
## GOVERNMENTAL TAKING OF PROPERTY

184.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

185.    Upon information and belief, the Defendant Town's zoning enacted in or about June 2005, and also in 2006 and 2007, were not designed to, and did not, substantially advance legitimate State or Town interests

186.    Upon information and belief, the actions of the Defendants in designing land use controls affecting Plaintiff's MareBrook proposal, considered cumulatively, were not designed to, and did not, substantially advance legitimate State or Town interests.

187.    Upon information and belief, the Defendant Town's zoning enacted in or about June 2005, and also in 2006 and 2007, were designed to deny, and did deprive Plaintiff of, the economically viable use of his land.

188.    Upon information and belief, the actions of the Defendants in designing land use controls affecting Plaintiff's MareBrook proposal, considered cumulatively, were designed to deny, and did deprive Plaintiff of, the economically viable use of his land.

189.    Upon information and belief, the individual Defendants were aware that their conduct violated, and was designed to violate, Plaintiff's federal rights, with the law in this area long established. *See, e.g., Agins v. City of Tiburon*, 447 U.S. 255.

190.   Upon information and belief, Defendants were, or should have been, aware that a governmental "taking" of property for which compensation must be paid results, for example, from municipal action involving repeated rejections, each time followed by requests for scaled-down development imposing more rigorous demands on the developer, and that the law has been long established in this regard. *See, e.g., City of Monterrey v. Del Monte Dunes*, 526 US 687 (1999) and *Palazzolo v. Rhode Island*, 533 US 606 (2001).

191.   Upon information and belief, the Defendant Town's actions in preserving open space and visual easements for the benefit of the subject property's neighbors and others in the Town constituted the invasion of Plaintiff's property, in the form of taking visual easement, and an easement to light and air, and thus a taking of Plaintiff's real property without the payment of just compensation.

192.   Upon information and belief, the indefinite, and potentially permanent, keeping of Plaintiff's lands in undeveloped, semi-forested state, thereby allowing it to be sown with tree seeds from neighboring property, is not materially different from being permanently flooding with water, and as such constitutes an actionable invasion of property by the action of the Town and thus an actionable taking of real property.

193.   Upon information and belief, Defendants' governmental actions and governmental processes created an extraordinary delay destroying the "incidents of ownership" to which Plaintiff is entitled under the Fifth and Fourteenth Amendments, thereby "taking" his property in the constitutional sense.

194.   Upon information and belief, through it actions, Defendants have perpetrated a *de facto* regulatory taking of Plaintiff's property, by essentially converting it to "open space" for the

ostensible ecological and aesthetic benefit of the Town (or to keep out senior citizens, the disabled, or Hassidic Jews), without paying just compensation for such taking.

**SECOND CLAIM FOR RELIEF—**
**DENIAL OF EQUAL PROTECTION OF THE LAW**

195.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

196.    Upon information and belief, Plaintiff Sherman has been denied the equal protection of the law in several respects, all rising to constitutional dimension.

197.    Upon information and belief, Plaintiff was not treated in the same manner as applicants identically situated, and with applicants substantially similarly situated, for reasons completely arbitrary, irrational and without basis in legitimate land use planning or justifiable regulation.

198.    Upon information and belief, Defendants disparately treated Plaintiff as a "class of one."

*"Reverse Spot Zoning"*

199.    Upon information and belief, the zoning actions of Defendants were intentionally directed at Plaintiff, to single him out and to discriminate against his MareBrook subdivision proposal.

200.    Upon information and belief, Defendants' zoning actions were site specific and inconsistent with, and contrary to, the Town's 1974 and 2003 Comprehensive Plans.

201.    Moreover, upon information and belief, the Defendants' actions would be inconsistent with any well-considered land-use plan for this community.

202.    Upon information and belief, this was impermissible "reverse spot zoning," designed to impermissibly prevent Plaintiff's legitimate use and development of his land.

33

Defendants engaged in "reverse spot zoning" by employing land-use decision-making which arbitrarily singled out a particular parcel of land, namely, Plaintiff's, for different, less favorable treatment than other property located in the neighborhood and the Town.

203.    Upon information and belief, one example of singling Plaintiff out for disparate treatment was the repeated, incremental change of the zoning requirements regarding clustering. Clustering is a favored land use planning tool, and proposed as such in Plaintiff's MareBrook proposal.   However, upon information and belief both Defendant Garling and Defendant Tully expressed the view that clustering was not intended for [Plaintiff's] large subdivision proposal, even though Plaintiff's proposal was a perfectly sound and appropriate for clustering. Moreover, as to clustering, the Defendant Town adopted a spot zoning approach to clustering, requiring site-specific approval of a clustering proposal, even though this directly contradicts State law, namely, N.Y.S. Town Law § 278, which permit general legislative directive to a planning board in the form of a general zoning ordinance, not a site-specific quasi-adjudicatory approval.

204.    The challenged zoning classification (with repeated re-zonings) rest on grounds wholly irrelevant to the achievement of the valid state objective of sound land use planning.  The basis of the classification was to single out Plaintiff and stop his project, regardless of its suitability under the Town's Comprehensive Plan, the organic land use document.

205.    Moreover, Defendants' zoning was not designed to implement the Town's Comprehensive Plan, but rather was designed as a tool to obstruct and harass the Plaintiff as a land use applicant and owner of a large parcel of land.

206.    Upon information and belief, there was no legitimate governmental objective advanced by the Defendant Town's regulatory actions.

207.    Upon information and belief, none of the Town's re-zonings, as applied to Plaintiff, had any fair and substantial relation to any legitimate governmental object.

208.    The zoning and re-zonings as applied to Plaintiff: (1) had no legitimate purpose, but rather were pretexts for disparate treatment, and (2) even if a legitimate purpose was articulated, such did not have, and were not intended to have, a fair and substantial relationship to such articulated purpose.

209.    Upon information and belief, the Town's zoning at issue is manifestly suspect and discriminatory.

210.    Upon information and belief, it is unlawful for governmental government authorities to burden property through the imposition of repetitive or unfair land-use procedures in order to deprive a landowner of the use of his or her property.

### THIRD CLAIM FOR RELIEF—
### DENIAL OF SUBSTANTIVE DUE PROCESS OF LAW

211.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

212.    The governmental action directed toward Plaintiff constitute an egregious violation of his rights and legitimate expectations as a property owner, and as such meet the threshold for a substantive due process claim established by the federal courts.

213.    Upon information and belief, based upon Plaintiff's submission with a proposal for the use of his real property fully in compliance with the Town's 1974 and subsequent 2003 Comprehensive Plans; and where his property rights vested by default in Planning Board action in December 2003; and where he subsequently complied with sequentially enacted zoning regulations in 2003, 2004, 2005, 2006 and 2007, with each zoning regulation altering the prior

35

zoning to obstruct Plaintiff's development of his land; and where the Town's Planning Board

was not allowed by the Defendants to approve Plaintiff's MareBrook proposal even though it

viewed the project as sound and approvable; and where the Defendants had impermissible

motivations, inconsistent with sound land use regulation and the Town's Comprehensive Plan for

obstructing and preventing Plaintiff's use, enjoyment and development of his land; under such

circumstances the Plaintiff had a legitimate expectation of entitlement to develop his land as he

had originally proposed.

214.    Plaintiff committed substantial assets to the development of his real property in

accordance with his MareBrook plan, and also undertook improvement as allowed by Town

regulation, e.g., infrastructure development, including road clearing work and the construction of

a substantially completed model home, thereby further demonstrating his reasonable expectation

of an entitlement to develop his land.

215.    Upon information and belief, Defendants denial of permission for Plaintiff to

develop his real property was improperly and maliciously motivated, involving an intentional,

long-term plan to deprive Plaintiff of all use of, and the development of, his land.

216.    Upon information and belief, as such, Defendants actions were egregiously

wrongful and arbitrary.

217.    Upon information and belief, the denial of Plaintiff's right to develop his land was

corruptly based, to profit the Garling Defendants financially, to profit Defendant Tully

politically, and the result of irrational community fears (e.g., fear of potential Hasidic Jewish

purchase; fear of senior housing) unrelated to proper considerations for the regulation of land.

218.    Upon information and belief, there was no legitimate basis for denying Plaintiff's

application upon any "health, safety or public welfare" basis.

36

219.    Upon information and belief, under the 1974 Comprehensive Plan under which Plaintiff purchased his property, and under the 2003 Comprehensive Plan which followed the moratorium initiated as a result of Plaintiff's proposal, and under the Zoning applicable to both master plans, Plaintiff's proposal employed favored methods for the development of land, such as clustering.

220.    However, the facts reveal that notwithstanding the merit of Plaintiff's proposal, and his compliance with all applicable land use regulation and guidance, the Town, for pretextual reasons and with an undisclosed anti-project agenda, refused to permit Plaintiff's proposal, and obstructed it in a manner offensive to fundamental due process.

221.    Upon information and belief, the Defendants pre-determined that the Town would not ever permit Plaintiff's proposal, but did so secretly and with the intention of constantly giving Plaintiff the "run around," such as by constantly amending the zoning law, with the intent of eventually exhausting the applicant, financially and otherwise.

222.    Upon information and belief, under existing rules or understandings that stem from state law—here, New York's land use regulations and master planning—Plaintiff had and has legitimate claim of entitlement to the land use he has sought from the Town.

223.    Alternatively, upon information and belief, in light of Defendants' conduct, the Town should be equitably estopped from denying Plaintiff's proposal and reasonable use of his land, and the Court should deem Plaintiff's rights has vested under the "special facts exception" based upon Defendants' improper actions.

224.    Upon information and belief, this is especially true since zoning, being in derogation to the common law, including New York's common law, must be strictly construed

37

against the municipality and in favor of the landowner who common law rights are sought to be infringed.

225.    Moreover, upon information and belief, under any construction of the Defendant Town's comprehensive plans, it is clear that Plaintiff's MareBrook proposal is a consistent and allowed use, and that Defendants post-2000 zoning laws improper reverse spot zoning.

226.    Upon information and belief, it is axiomatic that Zoning regulations must be adopted in compliance with a comprehensive plan adopted for the municipality. See, e.g., Town Law § 263.

227.    Upon information and belief, the failure to comply with the mandate that zoning regulations comply with a community's comprehensive plan renders the enactment of a zoning law unauthorized and *ultra vires.*

228.    Upon information and belief, because Defendants' zoning does not comport with its Comprehensive Plan with regard to the regulation of Plaintiff's property, the zoning constraints placed upon Plaintiff were arbitrary, ultra vires, null and void.  Plaintiff should be allowed his proposed sound use of his property.

### FOURTH CLAIM FOR RELIEF—
### DENIAL OF PROCEDURAL DUE PROCESS OF LAW

229.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

230.    Upon information and belief, plaintiff had various property and liberty rights concerning his real property, including the right to reasonably use his real property and avail himself of State law protections regarding his property.

231.    Accordingly, upon information and belief, the Defendant local government was required to provide Plaintiff with basic due process procedures—notice and an opportunity to be heard—regarding its actions intended to affect his ability to use and develop his real property.

232.    Upon information and belief, Defendants intentionally deprived Plaintiff of procedural due process right to which Plaintiff was entitled.  In this regard, upon information and belief, the Defendant Town:

- failed to apprise Plaintiff of its and its Supervisor's intentions regarding his real property (including their secret agenda and intention to obstruct any and all development);

- failed to provide Plaintiff with notice of, and an opportunity to respond to (Defendant Town's and its Supervisor's unarticulated and impermissible) grounds for obstructing Plaintiff's proposal;

- failed to provide plaintiff with notice of governmental meetings (e.g. Town Board and it "Zoning Committee") proposing governmental action specifically affecting Plaintiff's real property and land-use proposals;

- failed to inform Plaintiff as to what was intended towards his project (namely, ongoing obstruction for the purpose of preventing all legitimate development);

- required Plaintiff to seek unauthorized procedures (e.g., County permission prematurely, without a town approved proposal)  intended as impossibilities.

233.    Upon information and belief, Plaintiff was entitled to actual notice of the new zoning(s), especially zoning directed at his project, yet received no such notice(s).

### *ZBA review made unavailable*

234.    Upon information and belief, Plaintiff may have been entitled to Zoning Board of Appeals review after the Defendant Town changed its zoning requirements applicable to Plaintiff mid-stream.

235.    Upon information and belief, by denying Plaintiff the means for such review, for example, by denying him the ability to receive a final decision by the Town's Planning Board, Plaintiff was denied procedural due process of law.

236.    Upon information and belief, Plaintiff was also denied procedural due process when the Planning Board failed to act on Plaintiff's DEIS and preliminary plat application, and canceled his public hearing without notice to him.

237.    Upon information and belief, Plaintiff was entitled to notice and the reasons for such cancellation, as this action by the Town was interpreted by the Town as requiring him to begin anew on the basis of the newly enacted zoning.

238.    Upon information and belief, if afforded a Planning Board a decision allowing an appeal to the ZBA, Plaintiff could have argued hardship or undue difficulty, based upon the new zoning, and perhaps obtained permission from that body to go forward.

239.    By being denied this, Plaintiff was denied procedural due process, regarding a procedural right he otherwise would have under New York law.


### FIFTH CLAIM FOR RELIEF—
### AGE AND DISABILITY DISCRIMINATION IN HOUSING

240.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

241.    Upon information and belief, by repeatedly denying Plaintiff the ability to pursue his MareBrook proposal, including its plans for retiree-oriented housing (and "over-55" housing), Defendants were imposing discrimination in public accommodations in violation of federal law and constitutional equal protection.

242.    Additionally, the elderly are often "regarded as" handicapped and, upon information and belief, Defendants regarding Plaintiff's potential housing buyers as such.

243.    Upon information and belief, Defendants denied Plaintiff's "over-55" housing proposal, and obstructed same, based upon discriminatory animus against persons over 55 years of age, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

244.    Upon information and belief, based upon its discrimination against the elderly, and its discrimination based upon the perception that handicapped persons would purchase or eventually occupy Plaintiff's housing, Defendants also violated the federal Fair Housing Act, 42 U.S.C. § 3601 to 3631, and the Housing for Older Persons Act of 1995, 42 U.S.C. §3607(b).

245.    Upon information and belief, the law of New York State views a retirement community as non-exclusionary, and properly "viewed as … for the general welfare of all people…."

246.    Upon information and belief, the Zoning Defendant Town violates the standards set out by the New York Court of Appeals in *Berenson v. the Town of New Castle*, 38 N.Y.2d 102 (1975) and *Continental Building Company v. Town of North Salem*, 211 A.D.2d 88 (3d Dep't. 1995), *app. dism'd., lv. den.*, 86 N.Y.2d 818 (1995), and other cases, in that it does not consider the present regional housing needs of the region in which the Town is located, and such regional housing needs, especially for retirees, are not otherwise adequately provided for.

247.    Plaintiff's actions in discriminating against Plaintiff's efforts to provide housing for retirees and the potentially disabled are arbitrary and unlawfully discriminatory.

41

### SIXTH CLAIM FOR RELIEF—
### RELIGIOUS DISCRIMINATION IN HOUSING,
### INCLUDING RLUIPA

248.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

249.    Plaintiff has the right to expect government action unaffected by religious prejudice.

250.    Upon information and belief, one motivation for obstructing Plaintiff's development of his property was the fear by citizens of the town, and by Defendant ex-supervisor Tully, that approval of Plaintiff's subdivision proposal could result in the invasion of a religious sect of ultra-Orthodox Hasidic Jews, and the potential for the creation of a new village.

251.    Upon information and belief, with the approval of housing in excess of 300 units comes the potential for 300 Hasidic families, and with that the potential for Village incorporation under New York law.

252.    Upon information and belief, since religious use of land has become a highly controversial and divisive subject in this region (in places such as the Village of Kiryas Joel, the Town of Ramapo, and Village of Pomona), with the potential for litigation under "RLUIPA," it is impossible to ignore this potential (biased and anti-Semitic) influence on the Town's land-use decision making.

253.    Discrimination jurisprudence does not require that the discrimination objected to be the sole cause of adverse action, but rather prohibits unlawful discrimination which is a *motivating* factor in the decision-making.

254.    Moreover, unlawful discrimination can be inferred from various conduct, such as the failure to follow regular procedures, or to constantly change procedures.

42

255.    Here, for example, the constant altering of the requirements applicable to Plaintiff's land-use subdivision suggests an undisclosed yet impermissible motivation to obstruct Plaintiff's legitimate use of land.

256.    This is analogous to an employer constantly changing employment criteria to prevent the hiring or advancement of an individual. If the individual so singled out was Afro-American, a woman, or, and Supervisor Tully may have feared here, a developer who might have an association with Hasidic Jews, the employer would be engaging in illegal employment discrimination by preventing the higher or advancement of individual based upon his race, gender, or religious affiliations.

257.    Upon information and belief, the discrimination against Plaintiff based upon the perception that he might sell housing to people who are Jewish is a violation of The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq.

258.    Additionally, because the complaint sufficiently articulates religious bias as a motivation for denying plaintiff's land-use proposals, the complaint states a claim under the First Amendment and 42 U.S.C. § 1983.


### SEVENTH CLAIM FOR RELIEF—
### VIOLATIONS FIRST AMENDMENT FREEDOM OF ASSOCIATION, OF RELIGION, OF POLITICAL NON-AFFILIATION, AND RIGHT TO PETITION GOVERNMENT FOR THE REDRESS OF WRONGS

259.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

### Religion & Association

260.    Upon information and belief, as alleged above, the perception that plaintiff may sell units or an approved subdivision two members of a particular religious affiliation, namely,

Hasidic Jews, reflects impermissible discrimination based upon religion and religious affiliation, as well as freedom of association.

### *Political Cronyism, not proper land use regulation, prevents development of Plaintiff's land*

261.    Upon information and belief, local applicants obtain approval of desired land-use applications, whereas plaintiff, a nonresident, has not.

262.    Upon information and belief, this disparate treatment is a result of political cronyism and Plaintiff's political non-affiliation.

### *Right to Petition is Denied*

263.    Upon information and belief, Plaintiff's "right to petition" claim is somewhat a reciprocal to his procedural due process claim.   Due process requires giving notice, thus potentially avoiding the creation of a grievance.   The right to petition involves the government receiving and considering providing redress to a grievance.

264.    Here, the Town did not provide Plaintiff with notice of its motivations and intentions, depriving Plaintiff of procedural due process.

265.    The Defendant Town also refused to receive and consider Plaintiff's related pleas to it, his "petition" to it as a First Amendment right.

266.    Plaintiff asked—petitioned—for permission to use and develop his land, and asked expressly and implicitly—petitioned—for redress and an explanation why he was constantly thwarted in proceeding forward, often "at the last minute" or immediately prior to a legitimately anticipated approval.

267.    Plaintiff repeatedly petitioned his government for permission to use his real property in a manner which he believed, and believes, is reasonable, appropriate, permissible and

in accord with the Town's regulatory guidance (e.g., as articulated in its Comprehensive Land Use Plan).

268.    Upon information and belief, the Defendant Town, as such, refused to meaningfully give bona fide consideration to Plaintiff's petition to it.

269.    Upon information and belief, instead, the Defendant Town and its former Supervisor, Defendant Tully, sought to give Plaintiff the impression that his petitions (including various land use applications) were being fairly considered, when in actuality these defendants where orchestrating devices and tactics for further frustrating Plaintiff in his desire to reasonably develop and use his real property.

270.    In refusing to meaningfully consider and address Plaintiff's petitions to it, including his various land use applications, Plaintiff was denied his First Amendment right to petition government for redress.

### EIGHTH CLAIM FOR RELIEF— TAKING OF PROPERTY THROUGH EXACTION OF PAYMENT FOR THE TOWN'S "CONSULTANTS" UNRELATED TO EXISTING LAND REGULATIONS

271.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

272.    Upon information and belief, the Garling Defendants presented unauthorized invoices for their services to the Town, including billings for work unrelated to existing regulations applicable to Plaintiff.

273.    Upon information and belief, the only basis for the Garling Defendants' to receive payment from the Defendant Town was for review, based upon existing regulations, of Plaintiff's proposal.

274.    Upon information and belief, the Garling Defendants' instead invoiced the Town for work done at the behest of Defendant Tully, for future zoning designed to obstruct Plaintiff's revised proposals responding to Town-enacted regulation.

275.    Thus, Defendant Tully and the Garling Defendants essentially used the Town as a conduit for exacting impermissible payments from Plaintiff, for unauthorized services ostensibly rendered to the Town, but which in actuality were rendered without legal authority.

276.    Plaintiff is entitled to reimbursement of all such unauthorized and wrongful exactions for purported "professional fees" paid by him in connection with his land-use application(s).

### NINTH CLAIM FOR RELIEF—
### VIOLATION OF THE RACKETEER INFLUENCE AND
### CORRUPT ORGANIZATIONS ACT ("RICO")
### 18 U.S.C. § 1961 et seq

277.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

278.    Upon information and belief, the fact herein set forth all the necessary elements for a civil claim under the Racketeer Influence and Corrupt Organizations Act (RICO"), 18 U.S.C. § 1961 et seq.

279.    Upon information and belief, the Garling defendants and Defendant Supervisor Tully engaged in various misconduct constituted crimes including, inter alia, fraud, attempted fraud and mail fraud, and depriving the Town of honest services.

280.    Upon information and belief, the misconduct alleged above, including but not limited to fraud, attempted fraud, and mail fraud, constituted separate and distinct predicate acts for the purposes of RICO, all in violation of RICO.

281.    Upon information and belief, the conspiracy and collusion between the defendants herein, is a predicate act for purposes of RICO.

282.    By their conduct, defendants have caused Plaintiff damage thereby.

*Treble Damages*

283.    In addition to actual damages, under RICO plaintiff is entitled to treble the amount of all damages suffered.

### TENTH CLAIM FOR RELIEF— SUPPLEMENTAL NEW YORK STATE LAW CLAIMS

284.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

285.    Plaintiff hereby asserts a supplemental claim for relief for all state law causes of action paralleling the federal claims set forth above, including but not limited to denial of equal protection of the law, denial of substantive and procedural due process of law, the regulatory taking of property without compensation, denial of the right to petition government, and discrimination on the basis of age, disability, religious and political non-affiliation.

286.    Upon information and belief, Defendants have deprived Plaintiff of his state law rights to, *inter alia*:

    a.  Equal protection under New York law;

    b.  Due process of law under New York law;

    c.  Compensation for the governmental taking of property for public use, including a claim for relief under Article I, § 7 of the N.Y.S. Constitution;

    d.  Freedom of discrimination based upon age, or physical disability, or religious affiliation or perceived affiliation;

    e.  The right to petition government for the redress of wrong;

    f.   Regulation of real property based upon legitimate master planning and not reverse spot zoning;

    g.   Deprivation of a vested right to preliminary subdivision approval proposal which Plaintiff obtained in or about December 2003 under N.Y.S. Town Law § 276(8), and the right for a default certification issued by the Town Clerk upon his demand;

287.    As to Plaintiff's requests for declaratory relief, upon information and belief, the statute of limitations is 6 years for challenging the illegality of legislation through a declaratory action.

### REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF, INCLUDING A PRELIMINARY INJUNCTION GRANTING PRELIMINARY SUBDIVISION APPROVAL

288.    Plaintiff hereby repeats and realleges each allegation contained in the paragraphs above as if fully set forth again here at length.

289.    Upon information and belief, Plaintiff, and Plaintiff's potential elderly and/or disabled purchasers of housing, will be irreparably injured, as will the public, if Plaintiff is not provided preliminary injunctive relief herein.

290.    As argued *infra*, Plaintiff's 2003 completed application must, as a matter of law, be deemed approved through the Town's default in holding a timely hearing.  Plaintiff requests that this Court declare Plaintiff's vested entitlement thereto, and direct, that the Town Clerk issue a default certificate of preliminary subdivision approval to Plaintiff, to be issued upon Plaintiff's request to the Town Clerk for same.

291.    Plaintiff will be irreparably harmed if his proposal is not allowed to proceed forward with the approval, or at a minimum preliminary plat approval, and therefore a preliminary and permanent injunction is necessary and appropriate.

WHEREFORE, plaintiff prays that this Court grant judgment to Plaintiff awarding damages and other appropriate relief as follows:

1. An award of plaintiff's actual damages in an amount not less than $31,000,000.00 for denying Plaintiff the equal protection of the law;

2. An award of plaintiff's actual damages in an amount not less than $31,000,000.00 for the unlawful taking of his real property;

3. An award of plaintiff's actual damages in an amount not less than $31,000,000.00 for denying Plaintiff his right to due process of law;

4. An award of plaintiff's actual damages in an amount not less than $31,000,000.00 for injury resulting from refusing to meaningfully consider Plaintiff's petitions for redress (in various forms) made to the Town;

5. An award of plaintiff's actual damages in an amount not less than $31,000,000.00 for injury resulting from Plaintiff endeavor to provide housing to senior citizens and the disabled, and liquidated damages thereto;

6. An award of punitive damage against the individual defendants for their intentional wrongdoing denying Plaintiff's constitutional rights;

7. An award of damages against the Garling Defendants and/or the Town, for unauthorized Town work paid to the Town by Plaintiff;

8. An award of treble damage as allowed by RICO;

9. An order enjoining defendants from engaging in the wrongful practices alleged herein;

10. An order declaring Plaintiff's right to develop his land, and declaring his right to preliminary subdivision approval of his original proposal and/or modifications thereof; and

11. An award of reasonable attorneys' fees and the costs of this action, together with such other and further relief as this Court may deem just and proper.

**Jury Demand**

Plaintiff requests trial by jury in this action.

Dated: Stony Point, New York
       May 5, 2008

MICHAEL D. DIEDERICH, JR.
*Attorney for Plaintiff*    (MD 2097)
361 Route 210
Stony Point, N.Y. 10980
(845) 942-0795
Mike@DiederichLaw.com

Attachment—Exhibit "1"

50

Complaint Exhibit "1"

# MareBrook Site Map

